1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10

11  MARCIA M. GLENN,                    )      Case No. SA CV 05-01058-PJW
                                        )
12              Plaintiff,              )
                                        )      MEMORANDUM OPINION AND ORDER
13       v.                             )
                                        )
14  JO ANNE B. BARNHART,                )
    Commissioner of the                 )
15  Social Security Administration,     )
                                        )
16              Defendant.              )
    _____)

17

18                                      I.

19                                 INTRODUCTION

20       Plaintiff brings this action seeking reversal of the decision by

21  defendant Social Security Administration ("the Agency") denying her

22  application for Disability Insurance Benefits ("DIB").  She asks the

23  Court to reverse the Agency's decision and award benefits to

24  Plaintiff, or, in the alternative, to remand the case to the Agency

25  for further proceedings.  For the reasons discussed below, the

26  decision of the agency is REVERSED, and the action is REMANDED for

27  further proceedings consistent with this opinion.

28

II.

FACTS

A.   Plaintiff's Personal History and Work History

Plaintiff was born on October 31, 1948.  (Administrative Record ("AR") 87, 369.)  She completed high school, and attended junior college.  (AR 100, 370-71.)  She has previous work experience as a teacher's aide, a "girl Friday," and office manager for a social psychologist.  (AR 103, 371-74.)  Plaintiff contends that, beginning in 1998, her progressively worsening symptoms caused her to work fewer and fewer hours until she became unable to work in 2002.  (AR 94, 372-73.)

B.   Plaintiff's Medical Condition and Treatment

In her application for DIB, Plaintiff stated that she suffered from "probable" multiple sclerosis ("MS"), including symptoms of numbness, tingling, falling down, tremors, speech problems, extreme fatigue, blurred vision, memory loss, and burning sensations in her legs, arms, hands, and feet.  (AR 94.)  She claimed that these conditions caused her to have difficulty standing and walking, performing tasks for more than ten minutes, moving and carrying objects, climbing stairs, reading, and caused "lowered accuracy."  (AR 94.)

Medical records from Plaintiff's primary care physician, Dr. Elaine Grodin, show that Plaintiff had hypothyroidism controlled with medication, and osteopenia in her hip and spine.  (AR 267-68, 300, 304.)  Beginning in 2000, Plaintiff complained of anxiety, and she was prescribed and found some relief with Paxil and Xanax.  (AR 266, 295, 298, 302, 304.)  A May 2003 cervical spine MRI also showed mild degenerative disc disease at C5-C6 and C6-C7.  (AR 274.)

2

1    After pregnancies in 1986 and 1988, Plaintiff reported instances
2  of falling down and having burning pain in her legs.  (AR 127, 248.)
3  She complained that the falling and pain increased gradually, and that
4  other symptoms appeared, including fatigue, weakness, and burning and
5  tingling sensations.  (AR 127.)  By 1999, she had a "working
6  diagnosis" of MS, although MRI and spinal fluid examinations had not
7  confirmed that diagnosis.  (AR 127.)

8    Over the years, none of the typical diagnostic tests for MS
9  confirmed Plaintiff's MS diagnosis, but each of her treating doctors
10 assessed Plaintiff as possibly having MS.  (AR 275, 286, 297.)  In
11 1999, Plaintiff was referred to neurologist Michael Graves for
12 diagnostic consultation.  Dr. Graves was able to rule out other
13 conditions as the cause of Plaintiff's symptoms, but was unable to
14 confirm the MS diagnosis or to provide any other definitive diagnosis.
15 (AR 122.)  Dr. Graves agreed that Plaintiff should continue taking
16 amantadine (an antiviral drug sometimes used to treat fatigue symptoms
17 of MS), but found use of disease-modifying MS treatments unjustified
18 without a firm diagnosis.  (AR 122.)

19   Plaintiff's treating neurologist, Dr. Hornstein, completed a
20 "Medical Evaluation Form," noting that Plaintiff suffered from
21 "possible" MS and severe fatigue.  (AR 320-21.)  He stated that
22 objective tests showed that Plaintiff had decreased sensation in the
23 left arm, left leg, and right foot, motor weakness in the extremities,
24 and mild tandem and gait difficulty.  (AR 320.)  Dr. Hornstein
25 indicated that Plaintiff was being medicated with Neurontin, Provigil,
26 acyclovir, Paxil, amantadine, and estrogen, and that she took over-
27 the-counter medication for insomnia.  (AR 320.)

28

1  C.    Administrative Background

2        1.    Prior Proceedings

3        Plaintiff filed an application for DIB on June 27, 2003.  (AR 87-

4  90.)  That application was initially denied on August 29, 2003, and

5  again on reconsideration.  (AR 82-85.)  Thereafter, Plaintiff

6  requested a hearing before an administrative law judge ("ALJ"), which

7  was granted, and a hearing was held on September 22, 2004.  (AR 86,

8  365, 391.)

9        2.    The Hearing Before the ALJ

10        Plaintiff and medical expert Dr. Sami Nafoosi testified at the

11  hearing.  (AR 365-90.)  The hearing was adjourned before it was

12  completed and continued to November 15, 2004, at which time Plaintiff

13  again testified, along with vocational expert Alan Boroskin and lay

14  witness Jerene Johnson.  (AR 391-33.)

15        Plaintiff testified that she began having symptoms in 1998.  (AR

16  372.)  She testified that her symptoms were progressive, and that

17  eventually her former employer allowed her to work when she felt "up

18  to it."  (AR 372.)  Plaintiff stated that eventually she had to stop

19  working due to burning in her arms, legs, hands, and feet, falling

20  down, deteriorating fine motor skills, and extreme fatigue.  (AR 374.)

21  Plaintiff testified that if she goes outside the house without someone

22  to hold on to, she uses a single-point cane for balance.  (AR 376.)

23  Plaintiff explained that she rarely cooks, and drives only once or

24  twice a week.  (AR 376-77.)  Plaintiff testified that hand tremors

25  caused problems writing and in other tasks requiring fine motor

26  skills.  (AR 399.)  She explained that the burning pain she felt

27  varied in intensity only between nine and ten on a ten-point scale,

28  and was helped only somewhat and for limited periods by medication.

4

1  (AR 400-01.)  Plaintiff testified that she could stand or walk only
2  for ten to 15 minutes before having to stop.  (AR 402.)  In addition
3  to the pain, fatigue, and balance problems to which she previously
4  testified, Plaintiff stated that she suffered dizziness and insomnia.
5  (AR 406, 412.)

6      Plaintiff also testified that she had been experiencing
7  depression for "a couple years," and had started seeing someone for
8  help.  (AR 408, 417-18.)  She testified that her depression affected
9  her life and prevented her from social interactions.  (AR 408-09.)
10 She also testified that she suffered from anxiety for which she took
11 Paxil.  (AR 410, 412.)  Plaintiff stated that she also had problems
12 with concentration and forgetfulness, which were part of the reason
13 she stopped working.  (AR 410-12.)

14     Based upon his review of the record and Plaintiff's testimony,
15 Dr. Nafoosi "accept[ed] that" Plaintiff had multiple sclerosis, as
16 well as arthritis in her neck, osteopenia (loss of bone density), and
17 either an adjustment or dysthymic disorder, but that these conditions,
18 neither individually nor in combination, met or equaled a Listing.
19 (AR 378-79.)  Dr. Nafoosi testified that Plaintiff was limited to:
20 lifting 20 pounds occasionally and ten pounds frequently; standing or
21 walking for three hours total in an eight-hour day, 30 minutes at a
22 time, and restricted to level surfaces; occasionally bending,
23 stooping, kneeling, squatting, crouching, or crawling; no balancing or
24 working at heights; no climbing stairs; and no holding her head in one
25 position for more than one hour at a time.  (AR 380-81.)  Dr. Nafoosi
26 opined that Plaintiff had no manipulative limitations, and that there

27
28

5

was no objective evidence that Plaintiff could not complete an eight-hour work day or a 40-hour week, or that Plaintiff would need excessive breaks or work absences.  (AR 381-82.)

Upon questioning by Plaintiff's attorney, Dr. Nafoosi admitted that the medical evidence showed findings of mild tremors, but stated that he did not find "consistent" evidence of tremors.  (AR 385.)  Dr. Nafoosi dismissed Plaintiff's claimed severe fatigue and blurred vision as symptomatology not relevant to his testimony.  (AR 385-87.)  Dr. Nafoosi also testified that, while someone taking Plaintiff's medications may suffer side effects, such effects would "markedly decrease" after taking the medications for three months or more.  (AR 387.)  With respect to Plaintiff's cognitive abilities, Dr. Nafoosi testified that her adjustment or dysthymic disorder would "resolve itself with treatment within a 12-month period of time," but that cognitive disorders were not within his expertise as an internist.  (AR 388-89.)

The hearing continued with testimony by a vocational expert.  The ALJ presented the expert with a hypothetical question, including Plaintiff's education and experience and a residual functional capacity matching that offered by Dr. Nafoosi.  (AR 395.)  The vocational expert testified that such a person would be able to perform Plaintiff's past work as an office manager.  (AR 395.)  The ALJ then amended the hypothetical to allow only work at a moderate pace, and to preclude jobs requiring "hypervigilence," or "intense interpersonal interactions,"  supervision of safety operations, working at high production quota, or rapid assembly line work.  (AR 395-96.)  Mr. Boroskin testified that such an individual still could perform Plaintiff's past work.  (AR 396.)

1     Jerene Johnson, Plaintiff's friend and former employer, also
2  testified at the hearing.  Ms. Johnson testified that she saw
3  Plaintiff two to three times per month for "maybe two hours" at a
4  time.  (AR 423-25.)  Ms. Johnson testified that Plaintiff did not
5  participate in hobbies and social activities as much as she once did.
6  (AR 424, 429.)  She also testified that, when Plaintiff was working
7  for her, she worked fewer and fewer hours until she was no longer able
8  to work.  (AR 425-26, 428-29.)  Ms. Johnson testified that Plaintiff
9  had become withdrawn and irritable, and had problems maintaining
10  concentration.  (AR 426.)

11     3.   The ALJ's Decision

12     The ALJ issued a decision denying Plaintiff's application for DIB
13  on January 28, 2005.  (AR 15-21.)  She analyzed Plaintiff's claims
14  under the Agency's five-step sequential evaluation process.  At step
15  one, she found that Plaintiff had not engaged in substantial gainful
16  activity since her alleged onset date.  (AR 16, 20.)  At steps two and
17  three, she found that Plaintiff had a neurological disorder (possibly
18  MS), cervical arthritis, osteopenia, and an adjustment or dysthymic
19  disorder, and that those impairments were "severe," but that they did
20  not meet or equal a Listing.  (AR 18, 20.)

21     The ALJ analyzed the medical evidence, including evidence from
22  Plaintiff's treating physicians, Dr. Graves, Dr. Hornstein, and Dr.
23  Grodin, regarding her complaints of fatigue, weakness, poor balance,
24  and pain dating from 1999.  (AR 16-17.)  The ALJ noted that Dr.
25  Hornstein had made objective findings of unsteady gait and weakness
26  and decreased sensation in her extremities, but also noted that none
27  of Plaintiff's physicians had definitively diagnosed MS.  (AR 17.)
28  The ALJ also considered the assessment of Dr. Moore.  Like Dr.

Hornstein, Dr. Moore noted unsteady gait and sensory loss, as well as decreased distal fine coordinated movements of the toes.  (AR 17.)

With respect to Plaintiff's mental impairments, the ALJ considered the opinion of examining psychologist Dr. Gale Schuler. The ALJ noted that Dr. Schuler found that Plaintiff's psychological distress would diminish Plaintiff's ability to complete complex tasks, concentrate for long periods, make work-related decisions, work within a schedule, complete an ordinary work day, interact appropriately with others, and respond to criticism.  (AR 17.)  The ALJ discounted Dr. Schuler's opinion, however, finding that Plaintiff had "pursued limited mental health treatment," and that Dr. Schuler's conclusions were not supported by "medical signs or findings."  (AR 18-19.)

The ALJ completed a Psychiatric Review Technique Form in which she indicated that Plaintiff suffered from a medically determinable "adjustment/dysthymic disorder," and that Plaintiff had mild limitations in activities of daily living and maintaining concentration, persistence, or pace, and mild to moderate limitation in maintaining social functioning.  (AR 22-35.)

The ALJ found Plaintiff's subjective complaints "less than fully credible."  (AR 19.)  The reasons given for discrediting her complaints were lack of objective medical evidence, limited and conservative treatment, and inconsistency with the lay testimony of Ms. Johnson.  (AR 19.)

In evaluating Plaintiff's residual functional capacity, the ALJ discredited the opinion of Dr. Hornstein, and the restrictive assessment in the form Dr. Hornstein completed, finding that Dr. Hornstein's opinion was not supported by objective findings, was inconsistent with evidence of record, and was based primarily on

1  Plaintiff's subjective complaints.  (AR 18-19.)  In place of Dr.

2  Hornstein's assessment, the ALJ found the opinions of state agency

3  neurologist Dr. Moore and internist Dr. Nafoosi "fully credible."  (AR

4  18.)  The ALJ adopted Dr. Nafoosi's residual functional capacity

5  assessment, amending it to preclude Plaintiff "from work activity

6  requiring hypervigilence, supervision of safety operations, intense

7  interpersonal interactions, and high production quota or rapid

8  assembly work."  (AR 19.)

9      At step four, based upon the vocational expert's testimony that

10  Plaintiff could return to her past work as an office manager as

11  performed by Plaintiff and as performed in the national economy, and

12  as a teacher's aide as performed by Plaintiff, the ALJ concluded that

13  Plaintiff's medically determinable conditions did not prevent her from

14  performing her past relevant work.  (AR 20-21.)  Accordingly, the ALJ

15  found that Plaintiff was not disabled.  (AR 20-21.)

16      Plaintiff requested that the Appeals Council review the ALJ's

17  decision, submitting declarations from Plaintiff and her lay witness,

18  in part based upon claims that the ALJ had misconstrued hearing

19  testimony.  (AR 7, 10, 354, 357-64.)  On September 9, 2005, the

20  Appeals Council denied Plaintiff's request for review.  (AR 4-6.)

21  Plaintiff filed the instant Complaint on October 28, 2005.

22                                III.

23                              ANALYSIS

24      Plaintiff alleges that the ALJ erred by failing to properly

25  address all of Plaintiff's impairments, particularly her mental

26  impairments, and by failing to properly consider the testimony of

27

28

                                  9

Plaintiff and Ms. Johnson, and the opinions of Dr. Hornstein and Dr.
Schuler.  (Joint Stipulation ("JS") 2.)  For the following reasons,
the ALJ's decision is reversed and the case is remanded.

A.   Standard Of Review

     "Disability" under Agency regulations is defined as the inability
to perform any substantial gainful activity due to any "medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for a
continuous period of not less than 12 months."  *See* 42 U.S.C.
§ 423(d)(1)(A).  The Court may overturn the ALJ's decision that a
claimant is not disabled only if the decision is not supported by
substantial evidence or is based on legal error.  *Magallanes v. Bowen*,
881 F.2d 747, 750 (9th Cir. 1989)(quoting *Green v. Heckler*, 803 F.2d
528, 529 (9th Cir. 1986)).  "Substantial evidence" is such "relevant
evidence as a reasonable mind might accept as adequate to support a
conclusion."  *Magallanes*, 881 F.2d at 750.  It is "more than a mere
scintilla but less than a preponderance."  *Tidwell v. Apfel*, 161 F.3d
599, 601 (9th Cir. 1998).  This Court must uphold the ALJ's conclusion
even if the evidence in the record "is susceptible to more than one
rational interpretation."  *Andrews v. Shalala*, 53 F.3d 1035, 1039-40
(9th Cir. 1995).

B.   The ALJ Improperly Discounted Plaintiff's Credibility

     Plaintiff challenges the ALJ's finding that she was not fully
credible, arguing that she should not be required to provide objective
medical evidence to support her symptoms because none exists.  (JS
24.)  Plaintiff also claims that the ALJ's other stated reasons for
discrediting her subjective complaints were inadequate.  (JS 24.)  For
the following reasons, the Court agrees with Plaintiff.

10

An ALJ must undertake a two-step analysis when considering a claimant's subjective symptom testimony. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). First, she must determine if the claimant has produced objective medical evidence of an impairment which could reasonably be expected to produce the symptoms alleged. *Id.* at 1281-82. Second, she must determine the claimant's credibility as to the severity of the symptoms. *Id.* at 1282. If the claimant produces objective medical evidence of an impairment and shows that the impairment could be expected to produce the symptoms alleged, the ALJ can only reject the claimant's testimony concerning the severity of the symptoms by citing specific, clear, and convincing reasons for doing so. *Id.* The ALJ may not discredit the claimant's testimony as to degree of pain merely because it is unsupported by objective evidence. *See Bunnell v. Sullivan*, 947 F.2d 341, 343, 346-47 (9th Cir. 1991)(*en banc*).

In making a credibility determination, the ALJ may take into account, among other things, (1) ordinary credibility evaluation techniques, (2) unexplained or inadequately explained failure to seek or follow treatment, and (3) the claimant's daily activities. *Smolen*, 80 F.3d at 1284. If the ALJ's credibility finding is supported by substantial evidence in the record, the Court may not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).[1]

---

[1] Social Security Ruling ("SSR") 96-7p provides that the ALJ's assessment of the credibility of subjective pain statements must be based on a consideration of all of the evidence in the case record, which includes, but is not limited to, medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions; statements and reports from the claimant and others; prior work record and

1    Plaintiff testified that "physically, [she did not] function,"
2    and that she was so fatigued that sometimes she couldn't even move.
3    (AR 374.)  She testified that her pain was, on average a "nine" on a
4    ten-point scale, and while it varied depending on the day and with
5    medication, at best it was still an "eight."  (AR 400-01.)

6        The ALJ found that Plaintiff had a neurological condition,
7    possibly MS, cervical arthritis, osteopenia, and dysthymic disorder.
8    (AR 19.)  Given the ALJ's acceptance that Plaintiff suffered from MS
9    or a similar medically-determinable neurological condition, she could
10   not then discredit Plaintiff's testimony regarding the severity of
11   symptoms that could reasonably be expected to result from that
12   condition without stating clear and convincing reasons for doing so.
13   *Smolen*, 80 F.3d at 1282.  The ALJ failed to meet this standard, saying
14   only that "there are few signs and findings establishing [Plaintiff's]
15   physical and mental impairments and none supporting these excessive
16   allegations."  (AR 19.)  The ALJ provided no specific examples of
17   "excessive allegations," nor any explanation of how the claimed
18   severity was unsupported.

19       The ALJ also noted "limited and conservative care" as a basis for
20   discrediting Plaintiff's claims.  (AR 19.)  While the treatment sought
21   by a claimant may properly be considered in the credibility analysis,
22   *Smolen* 80 F.3d at 1284, the ALJ failed here to support his conclusion
23   that the care Plaintiff received was "not what one would expect" for
24   her ailment.  (AR 19.)  Plaintiff was treated with a variety of
25   medications for her condition, including amantadine and Provigil for
26
27   _____
28   efforts to work; daily activities; and observations about the
     individual.

fatigue, Neurontin for burning and tingling sensations, and Paxil for depression.  (AR 340.)  Dr. Graves had also considered MS medications, including interferons and Copaxone, but ruled out their use until there was a definitive MS diagnosis.  (AR 122.)  In the absence of any suggestion as to what additional treatment Plaintiff might have obtained, but did not obtain, the Court cannot say that there was substantial evidence of "limited and conservative care" supporting the ALJ's decision to discredit Plaintiff's complaints.[2]

Finally, the ALJ found that Plaintiff's claims were contradicted by the testimony of her friend, Ms. Johnson.  There are two problems with this finding.  First, as discussed below, it appears that the ALJ misunderstood Ms. Johnson's testimony.  Ms. Johnson testified that she saw Plaintiff two or three times a month, and had last seen her at a concert.  (AR 423.)  She testified that, about once every six months, she helped Plaintiff put pictures into a scrapbook, and that sometimes Plaintiff came to her house to sing with friends.  (AR 424.)  Ms. Johnson testified that she usually saw Plaintiff for short periods of two hours or so in an effort to get Plaintiff "out of the house for a little bit."  (AR 424.)  Ms. Johnson also testified that sometimes she would visit Plaintiff, but Plaintiff would be too fatigued to get out of bed or make conversation.  (AR 428.)  From this testimony, the ALJ concluded that Plaintiff and Ms. Johnson recently attended a concert and "often go to other performing arts events and meet for lunch," and that Plaintiff is "involved in scrapbooking and a singing group."  (AR

---

[2]   The Court has no independent knowledge of the appropriate care for MS patients and the record does not contain an explanation as to what appropriate care is.  Absent some basis to conclude that Plaintiff's care was substandard, the Court cannot affirm the ALJ's finding that it was.

19.)  The ALJ clearly misunderstood or misconstrued Ms. Johnson's testimony, an error Plaintiff attempted to rectify in supplemental declarations submitted to the Appeals Council.  (AR 7, 357-64.)

Secondly, the Court disagrees that the activities testified to by Ms. Johnson undermined Plaintiff's claimed symptoms and disability.  A claimant need not be "utterly incapacitated" in order to be disabled. *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).  The activities described by Ms. Johnson--occasional visits to her home to sing, attending a short concert, and organizing photographs--were infrequent events of short duration.  (AR 363-64, 423-25.)  Ms. Johnson additionally testified that Plaintiff is frequently unable to engage in such activities or even to interact with visitors.  (AR 428.)  This testimony was not inconsistent with Plaintiff's own statements regarding her activities.  (AR 107-09, 408-09, 414-15.) Moreover, the activities described by Ms. Johnson are not necessarily transferrable to a work setting.  The ALJ provides no basis for her apparent belief that Plaintiff's ability to participate in occasional social engagements of short duration undermines her claim that she would be unable to maintain regular employment.  Thus, this reason for discounting Plaintiff's testimony is also rejected.

Having concluded that the ALJ's reasons for rejecting Plaintiff's credibility are not supported by substantial evidence, the ALJ's credibility finding is reversed.  On remand the ALJ should credit her testimony.

C.   The ALJ Failed To Provide Specific And Legitimate Reasons For Rejecting The Opinions Of Plaintiff's Treating Physician And An Examining Psychologist

Plaintiff claims that the ALJ improperly rejected her treating

14

1  physician's and the examining psychologist's opinions, in favor of the

2  opinions of an examining neurologist and a nonexamining internist.

3  (AR 13-15, 18-20.)  For the following reasons, the Court finds that

4  the ALJ failed to set forth proper bases for discrediting the opinions

5  of Plaintiff's treating physician and the examining psychologist's

6  opinion.[3]

7       The ALJ is tasked with resolving conflicts and ambiguities in the

8  medical record.  *Andrews*, 53 F.3d at 1039.  Thus, the ALJ determines

9  which medical opinions should be given the most weight in light of the

10 general rule in this circuit that, among the three types of

11 physicians--(1) treating physicians, i.e., those who treat the

12 claimant; (2) examining physicians, i.e., those who examine but do not

13 treat; and (3) nonexamining physicians, i.e., those who neither

14 examine nor treat--the most weight should be given to the opinion of a

15 treating source.  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

16 1996).  "The opinion of an examining physician is, in turn, entitled

17 to greater weight than the opinion of a nonexamining physician."  *Id.*

18      A treating physician's opinion on the nature and severity of an

19 impairment will be given controlling weight if it is "well-supported

20 by medically acceptable clinical and laboratory diagnostic techniques

21 and is not inconsistent with the other substantial evidence in [the]

22 case record."  20 C.F.R. § 404.1527(d)(2).  Although a treating

23

24      [3]  Plaintiff's Issue No. 2 as set forth in the Joint Stipulation
25 asserts that the ALJ failed to address all of Plaintiff's impairments.
   This issue, as set forth in the brief, however, is largely duplicative
26 of or related to Plaintiff's other claims regarding the ALJ's
   consideration of the opinions of Dr. Hornstein and Dr. Schuler, and
27 accordingly is addressed by the Court in this context.  The remainder
   of Issue No. 2 addresses Plaintiff's subjective complaints, which the
28 Court addresses *supra*.

physician's opinion is generally afforded more weight in disability cases than a nontreating physician's opinion, it is not binding on an ALJ. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). The ALJ "need not accept a treating physician's opinion which is brief and conclusionary in form with little in the way of clinical findings to support [his or her] conclusion." *Magallanes*, 881 F.2d at 751 (internal quotations omitted); *see also Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)(noting that the ALJ need not accept a treating physician's opinion that is "conclusory and unsubstantiated by relevant medical documentation"). "The ALJ may disregard the treating physician's opinion whether or not that opinion is contradicted." *Magallanes*, 881 F.2d at 751.

To reject the conflicting or contradicted opinion of a treating physician, "the ALJ must 'make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Id.* (quoting *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)). An ALJ may meet this burden by setting forth a detailed summary of the facts and the conflicting evidence, stating his interpretation of the evidence, and making findings. *Id.; see also Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

"Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict." *Andrews*, 53 F.3d at 1041. If, on the other hand, the nontreating source relies on the same findings as the treating source, the ALJ must provide specific and legitimate reasons

16

1  for disbelieving the treating source.  *Id.*

2      1.   The ALJ Improperly Rejected The Residual Functional Capacity

3           Opinion Of Dr. Hornstein

4      Plaintiff complains that the ALJ improperly rejected the opinion

5  of Dr. Hornstein.  The ALJ gave it "[l]imited weight" because the

6  opinion: (1) was not supported by clinical and laboratory findings;

7  (2) was inconsistent with substantial evidence of record; (3) appeared

8  to rely predominantly on Plaintiff's subjective symptoms; and (4) was

9  belied by the limited and conservative treatment given to Plaintiff.

10 (AR 18.)  The Court finds each of these stated reasons defective, and,

11 therefore, cannot conclude that they singly or collectively support

12 the ALJ's decision to give "limited weight" to Dr. Hornstein's opinion

13 and to reject his conclusion that Plaintiff was disabled.

14     The clinical and laboratory findings of Dr. Hornstein were not

15 remarkably different from those of state agency physician Dr. Moore.

16 Dr. Hornstein's records, from nine visits over approximately 19

17 months, show consistent objective findings of unstable gait and

18 problems tandem walking and swaying with the Romberg test (where the

19 patient is asked to stand with feet together and eyes closed),

20 decreased sensation in the lower extremities, and brisk reflexes in

21 her lower legs.  (AR 320, 327-31, 333-35, 338-44.)  Occasionally, Dr.

22 Hornstein noted "mild halo" or blurry vision, although vision tests

23 performed at his request showed that Plaintiff had 20/20 vision.  (AR

24 327-28, 335.)  Dr. Hornstein also occasionally noted mild tremors and

25 dysmetria.  (AR 149, 327, 338).

26     Despite Plaintiff's complaints about the duration of Dr. Moore's

27 examination, the record shows that Dr. Moore made remarkably similar

28 findings to Dr. Hornstein.  Dr. Moore found slight decrease in distal

fine coordinated movements of the toes, unsteady gait and inability to tandem walk, and decreased sensation in the lower extremities.  (AR 230.)  Dr. Nafoosi, the internist called as the medical expert at the hearing, largely adopted Dr. Moore's assessment, and accepted for purposes of his testimony that Plaintiff had MS despite the lack of diagnosis.  (AR 378.)

The only substantial difference between the two doctors' findings were in their opinions of Plaintiff's residual functional capacity. Dr. Hornstein's assessment was very restrictive, opining that Plaintiff could not work an eight-hour day regardless of whether she had to sit, stand, or both, that she needed to rest four to six hours in an eight-hour day, and that she should do no lifting, no repetitive grasping, pushing, pulling, fine manipulation, bending, squatting, kneeling, climbing, or reaching.  (AR 320-21.)  He also restricted Plaintiff from working at unprotected heights and noted that she had extreme heat sensitivity.  (AR 321.)

Dr. Moore, on the other hand, opined that Plaintiff had full functional use of her upper extremities, that she could sit for indefinite periods of time, but that she could not climb, balance, or work at heights, and occasionally bend and stoop.  Dr. Moore also opined that Plaintiff could not stand or walk more than three hours in an eight-hour day or more than 20 to 30 minutes at a time without assistive devices, and that she should stand or walk only on level surfaces.  (AR 231.)  He found that she could lift 25 pounds occasionally and ten pounds frequently.  (AR 231.)  At the hearing, Dr. Nafoosi largely agreed with the opinion of Dr. Moore with respect to Plaintiff's residual functional capacity.  Dr. Nafoosi reduced the amount that Plaintiff could lift occasionally from 25 to 20 pounds.

He also added that she could occasionally kneel, squat, crouch, or crawl, and that she should not work in a job where she would have to hold her head in a position for more than an hour at a time. (AR 380-81.) Dr. Nafoosi did not find any evidence that Plaintiff could not complete an eight-hour work day or 40-hour work week, or that she would need excessive breaks or absences. (AR 381.)

It appears that the state agency doctors whose opinions the ALJ accepted relied predominantly on the same clinical findings as Dr. Hornstein. In such a case, the ALJ must provide specific and legitimate reasons for disbelieving the treating source. *Andrews*, 53 F.3d at 1041. The ALJ's finding that Dr. Hornstein's opinion was not supported by "clinical and laboratory findings" is not sufficiently clear or specific. The ALJ's decision is devoid of any explanation of what portion of Dr. Hornstein's opinion was unsupported, or what clinical or laboratory findings undermine his opinion.

Given the similarity of the various doctors' clinical findings, and the ALJ's failure to provide any specific explanation of why Dr. Moore or Dr. Nafoosi was more credible, the Court cannot affirm the ALJ's decision. While Dr. Hornstein's assessment of functional capacity may seem extremely restrictive next to that of the other doctors, as Plaintiff's treating doctor, Dr. Hornstein was considerably more familiar with Plaintiff's condition and the severity of her symptoms, and his opinion is therefore entitled to deference. 20 C.F.R. § 404.1527(d)(2). The ALJ did not provide specific, clear, and convincing reasons to credit the opinions of the nontreating doctors--and to accept the opinion of a nonexamining doctor--over the opinion of Plaintiff's treating physician.

With respect to the ALJ's finding that Dr. Hornstein's opinion

19

should be discounted because it was inconsistent with "substantial evidence of record," and his "limited and conservative treatment" (AR 18), the Court finds that the ALJ failed to adequately explain her reasoning.  Nowhere in her decision does the ALJ identify the "substantial evidence" with which Dr. Hornstein's opinion is purportedly inconsistent.  Similarly, and as discussed above with respect to Plaintiff's credibility, the ALJ made no effort to explain her finding that Plaintiff has received "limited and conservative treatment."  Without any explanation as to what treatment Plaintiff might otherwise have received, the Court cannot say that the ALJ provided the required specific, clear, and convincing reasons to discredit the opinion of Plaintiff's treating physician.

To the extent that the ALJ discredited Dr. Hornstein's opinion because it relied "mostly on [Plaintiff's] subjective symptoms," in light of the Court's finding that the ALJ failed to properly assess Plaintiff's credibility, this factor cannot support the ALJ's decision, either.  On remand, the ALJ should reconsider the medical evidence.

2.   The ALJ Improperly Discredited The Opinion Of Examining
     Consultant Dr. Schuler With Respect To Plaintiff's Mental
     Impairments.

The only opinion by a mental health professional in the record is the opinion by state agency psychologist Dr. Schuler.  Dr. Schuler conducted a thorough psychological evaluation of Plaintiff.  (AR 246-58.)  She administered various objective tests, including REY, WAIS-R, and MMPI-2 tests in addition to self-reporting questionnaires.  In particular, Dr. Schuler found that Plaintiff's WAIS-R scores suggested the presence of "anxiety and/or depression negatively impacting

overall cognitive function," and that Plaintiff's MMPI-2 scores
indicated the likely presence of "depression, anxiety, nervousness,
and tension," and indicate a person who is "worrying, indecisive, has
difficulty with concentration, overreacts to problems, is
apprehensive, and may have an obsessive, ruminative thought style."
(AR 252-53.)  Dr. Schuler also noted that Plaintiff's MMPI-2 profile
is "occasionally associated with neurological problems."  (AR 253.)

        Based upon her examination, objective testing, and self-reporting
questionnaires, Dr. Schuler assessed Plaintiff as having a dysthymic
disorder of moderate severity (clinical depression), generalized
anxiety disorder with panic attacks, chronic pain disorder associated
with psychological factors and a medical condition, and histrionic
personality qualities.  (AR 256.)  Dr. Schuler observed that
Plaintiff's memory and concentration were average, but found that
those abilities might "not always [be] available" to Plaintiff due to
her psychological distress.  (AR 258.)  Accordingly, Dr. Schuler
concluded that Plaintiff's "persistence at a task, capability to
complete complex tasks, concentrate for long periods and make work-
related decisions" were diminished.  (AR 258.)  Dr. Schuler gave
Plaintiff a Global Assessment of Functioning score of 50, which
indicates "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment
in social, occupational, or school functioning (e.g., no friends,
unable to keep a job)." *See* American Psychiatric Association,
Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition,
Text Revision 32-34 (4th ed. 2005).  Dr. Schuler noted that Plaintiff
was medicated with Paxil, which provided some control of her symptoms,
but that Plaintiff required "continuing use of medication and

1   therapeutic interaction."  (AR 257.)

2       Dr. Schuler completed a "Mental Assessment" form in which she

3   noted that Plaintiff had slight to marked limitations in several

4   mental functions.  (AR 259-62.)  Dr. Schuler concluded that Plaintiff

5   was "totally psychiatrically disabled," had likely been so since 2000,

6   and would likely continue to be disabled for at least twelve months.

7   (AR 258.)

8       With respect to Plaintiff's mental impairments, the ALJ rejected

9   Dr. Schuler's opinion.  The ALJ stated that Dr. Schuler's assessment

10  implied "some extreme limitations," but was not supported by "her own

11  findings and prescribed treatment."  (AR 19.)  She also found that

12  Plaintiff had pursued limited mental health treatment and Dr.

13  Hornstein prescribed "limited and conservative care."  (AR 19.)  The

14  Court finds that these reasons were insufficient to reject Dr.

15  Schuler's opinion.

16      The only specific mental impairments addressed by the ALJ were

17  Plaintiff's memory and concentration skills.  Despite Dr. Schuler's

18  opinion that those skills were present but unavailable to Plaintiff

19  due to her depression and anxiety, the ALJ supplanted Dr. Schuler's

20  findings with those of Dr. Moore, a neurologist, who had not

21  undertaken any psychological examination of Plaintiff, but, rather,

22  had administered a few cognition tests in the course of his

23  neurological examination.  (AR 19, 229.)  As an examining

24  psychologist, Dr. Schuler's opinion should have been given greater

25  weight than that of Dr. Moore, who did not conduct a psychological

26  examination.  20 C.F.R. § 404.1527(d)(1).

27      Moreover, the findings of the ALJ with respect to Plaintiff's

28  mental capacity appear not to be based on the opinion of any of the

medical or psychological findings.  The ALJ concluded that Plaintiff
was precluded from work involving "hypervigilence, supervision of
safety operations, intense interpersonal interactions, and high
production quota or assembly line work." (AR 19.)  No such
restrictions were formulated by any of the treating, examining, or
consultative doctors.  Strangely, such restrictions do not even
correspond to the ALJ's own assessment in the Psychiatric Review
Technique Form she completed. (AR 22-35.)  In that form, the ALJ
found that Plaintiff had an adjustment/dysthymic disorder, and that
She had resulting functional limitations including mild limitations on
activities of daily living and maintaining concentration, persistence,
or pace, and mild to moderate difficulty maintaining social
functioning.  (AR 25, 32.)  These findings were inexplicably absent
from the ALJ's questions to the vocational expert and from her
decision, errors which should be corrected on remand.

The opinions of Dr. Moore (based on his neurological examination)
and Dr. Schuler (based on her psychological examination) were similar
with respect to the presence of memory and concentration skills.  (AR
229, 258.)  Dr. Schuler, however, performed additional testing and
concluded that, while those skills may be intact, they were "not
available" to Plaintiff due to her depression and anxiety.  (AR 258.)
The ALJ provided no legitimate basis for discrediting this finding.
The ALJ stated that Dr. Schuler's conclusion was "not supported by
[her] own findings." (AR 19.)  The Court disagrees.  Dr. Schuler
clearly set forth her objective findings regarding Plaintiff's
depression and anxiety, and clearly explained how these conditions
would likely affect Plaintiff's capacity.  Accordingly, the ALJ's

1    rejection of Dr. Schuler's conclusions on the basis of lack of

2    evidence lacks the required support.[4]

3    D.   The ALJ Improperly Considered Lay Testimony

4         Plaintiff contends that the ALJ failed to properly consider an

5    opinion from her chiropractor and lay testimony from a friend at the

6    hearing.  (JS at 3-5, 9.)  In determining whether a claimant is

7    disabled, an ALJ must consider lay witness testimony concerning a

8    claimant's ability to work.  *Stout v. Commissioner*, 454 F.3d 1050,

9    1053 (9th Cir. 2006); *Smolen*, 80 F.3d at 1288; 20 C.F.R.

10   §§ 404.1513(d)(4), (e).  The ALJ may discount the testimony of lay

11   witnesses only if she gives "reasons that are germane to each

12   witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *see*

13   *also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)("Lay testimony

14   as to a claimant's symptoms is competent evidence that an ALJ must

15   take into account, unless he or she expressly determines to disregard

16   such testimony and gives reasons germane to each witness for doing

17   so." (citations omitted )).  An ALJ "need not discuss all evidence

18   presented to her," but rather must explain why significant probative

19   evidence has been rejected.  *Vincent*, 739 F.2d at 1394-95.

20        1.   Chiropractic Evidence

21        Plaintiff's chiropractor, Amy B. Friedman, opined that Plaintiff

22   would be able to perform "non-physical part-time" work subject to

23

24        [4]  To the extent the ALJ may have relied on the testimony of the
25   medical expert, Dr. Nafoosi, that Plaintiff's adjustment or dysthymic
     disorder would "resolve itself with treatment within a 12-month period
26   of time" (AR 388), such reliance would also be error.  This conclusion
     was meaningless inasmuch as it directly contradicted the opinion of
27   Dr. Schuler, was completely unsupported by evidence, and, by Dr.
     Nafoosi's own admission, Plaintiff's mental and psychological
28   condition was not within his expertise as an internist.  (AR 388-89.)

additional functional limitations.  (AR 165-66.)  Plaintiff contends
that the ALJ improperly disregarded this opinion and evidence from her
chiropractic care.  (JS at 9.)  Indeed, the ALJ's decision does not
even mention the fact that Plaintiff had received chiropractic care,
much less address the voluminous chiropractic records in the record.
While a chiropractor is not a medical source whose opinion is entitled
to the same weight as that of a treating physician, this does not mean
that her opinion may be disregarded completely.  The regulations
clearly provide that evidence from a chiropractor may be used as
evidence of the severity of a claimant's impairment.  20 C.F.R.
§§ 404.1513(d)(1).  The ALJ, at the very least, was required to
address Dr. Friedman's opinion and to state reasons for rejecting it.
*See Dodrill*, 12 F.3d at 918-19 (9th Cir. 1993)(holding that the
rejection of even lay witness testimony requires reasons germane to
the witness).  On remand, the ALJ should consider all evidence in the
record, including chiropractic evidence.

      2.  <u>Lay Witness Jerene Johnson</u>

As discussed above with respect to Plaintiff's credibility, the
ALJ clearly misinterpreted or misstated the testimony of Ms. Johnson.
Given her relationship to Plaintiff as a friend and Plaintiff's last
employer, Ms. Johnson was in a position to observe Plaintiff's
symptoms and daily activities, and, therefore, was competent to
testify as to her condition.  *Dodrill*, 12 F.3d at 918-19.  On remand,
the ALJ should take a closer look at this testimony.

1                                    IV.

2                               CONCLUSION

3         For the reasons set forth above, the decision of the Agency

4    denying Plaintiff's claim for DIB is reversed and the case is remanded

5    for further proceedings consistent with this Opinion.

6

7         IT IS SO ORDERED.

8         DATED:      March 12, 2007.

9

10

11   _____
     PATRICK J. WALSH
12   UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   S:\PJW\Cases-Soc Sec\GLENN, M\Memo_Opinion_Ord.wpd

                                    26